**NOT FOR PUBLICATION**

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | | |
|---|---|---|
| WILLIE NEVIUS, | : | |
| | : | |
| Plaintiff, | : | Civil No. 07-3180 (JAP) |
| | : | |
| v. | : | |
| | : | |
| NEW JERSEY STATE POLICE, et al., | : | **OPINION** |
| | : | |
| Defendants. | : | |
| | : | |

PISANO, District Judge:

Plaintiff Nevius brings this suit against Defendants New Jersey Turnpike Authority

("NJTA")[1], and the "Head" of the NJTA (together, the "NJTA Defendants"); individual

Defendants Detective Sergeant Ronald Hampton[2] and Detective Daniel Bergin[3] (together, the

"Trooper Defendants"); and the New Jersey State Police ("NJSP")[4] and NJSP Superintendent

Lieutenant Colonel Joseph Fuentes (collectively with the Trooper Defendants, the "NJSP

Defendants") alleging violations of his constitutional rights stemming from a motor vehicle stop

---

[1]      Defendant New Jersey Turnpike Authority is an independent public agency
responsible for the operation and control of the Turnpike.

[2]      Defendant Ronald Hampton bears badge number 5162.

[3]      The parties have indicated that State Trooper Steve Levash bears badge number
6352, which was associated with a John Doe defendant.  However, as Trooper Levash was never
served with the Complaint in this case, the Court does not consider him a party to this action.

[4]      Defendant New Jersey State Police is a general-powers police agency with state
wide jurisdiction, including the responsibility of patrolling the Turnpike.

1

on the New Jersey Turnpike on December 9, 2006.  Before the Court are the NJTA Defendants'

Motion to Dismiss under Federal Rule of Civil Procedure 12(c), and the NJSP Defendants'

Motion for Summary Judgment pursuant to Federal Rule of Civil Procedure 56(c).[5]  Oral

argument was held in this matter on January 13, 2008.  For the reasons that follow, both motions

are granted.

## I.    Background[6]

In August of 2006, Defendant Bergin met with Detective O'Brien of the Plainfield Police

Department in connection with an on-going criminal narcotics investigation of Shawqi Gray

("Gray"), a suspected gang member and large-scale narcotics distributor.[7]  After a series of

controlled narcotics purchases arranged between Gray and a confidential police informant during

---

[5]    The NJTA Defendants joined in the NJSP Defendants' Motion for Summary Judgment by letter on May 29, 2008.  (Docket Entry No. 17).

[6]    Under Local Civil Rule 56.1, where the non-movant fails to respond to an allegation contained in the movant's statement of undisputed material facts (the "56.1 Statement"), such allegations are deemed admitted by the non-movant.  *See, e.g., Sampson v. Ctr. for Family Guidance*, 2007 U.S. Dist. LEXIS 60749, *1 n.1 (D.N.J. Aug. 16, 2007) (where plaintiff did not file a 56.1 Statement, "all facts contained in [d]efendants' [56.1 Statement] will be deemed admitted if they are supported by evidence and not contradicted by [p]laintiff's opposing evidence").  Because Plaintiff's 56.1 Statement contains no allegations of conduct prior to the December 9, 2006 motor vehicle stop, the Court considers Plaintiff to have admitted to the facts in the NJSP Defendants' 56.1 Statement relating to pre-stop activity.

[7]    For the following factual recitation, the Court relies on the NJSP Investigation Reports, which were properly authenticated and are excepted from the hearsay rule under Federal Rule of Evidence 803(8).  *See Clark v. Clabaugh*, 20 F.3d 1290, 1294 (3d Cir. 1994) ("We note further that Federal Rule of Evidence 803(8)(C) explicitly excepts public records and reports 'resulting from an investigation made pursuant to authority granted by law,' from exclusion under the hearsay rule, because official reports contain inherent indicia of trustworthiness. Thus, the [police r]eport, which was authored by officers charged with a legal duty and authorized to conduct the investigation, is presumed admissible under Rule 803(8)(C), including its opinions, conclusions and recommendations, unless the [non-movants] demonstrate its untrustworthiness.").  Plaintiff has not challenged the trustworthiness of the reports.

the next several months, Defendant Bergin, along with his NJSP colleagues, conducted telephonic surveillance of Gray pursuant to multiple warrants issued by a New Jersey Superior Court judge.  Based on certain intercepted communications between Gray and several unidentified males, Bergin and members of the Plainfield Police Department believed that Gray intended to transport narcotics to the North Carolina area.  Thereafter, Detective O'Brien and another Plainfield Police Department officer, Detective Mulligan, commenced physical surveillance on December 9, 2006 at 540 West Fifth Street, Plainfield, New Jersey, a premises believed to serve as Gray's drug warehouse.  At around 3:30 pm, Detectives O'Brien and Mulligan observed Plaintiff Nevius arrive at the premises in a white van with North Carolina registration.  Gray exited the premises and entered Nevius's vehicle on the passenger side approximately one minute after Nevius pulled up.  The Plainfield detectives followed the van as it headed directly to 918 Watchung Avenue in Plainfield and parked.  Nevius and Gray exited the van and, after waiting approximately two minutes, met with an unidentified third man in the garage at the rear of the premises, outside the view of the surveilling officers.  When Nevius and Gray returned to the white van, Nevius carried with him a black plastic bag.  The two then departed the premises.  The van was next observed stopping at the 200 block of East Front Street in Plainfield, and both Nevius and Gray exited the van for about one minute.  The two men then re-entered the van and remained parked for approximately fifteen minutes.  The van departed that location and went directly to 540 West Fifth Street, where Gray exited the vehicle and entered the premises.  Gray called out to Nevius from indoors, and Nevius left the van and  entered the residence.  The Plainfield detectives did not observe either man holding the black plastic bag when they exited the van.  Nevius left the residence, re-entered the van, and drove away from the

3

area.

Nevius was followed, though it is unclear from the evidence by whom, through Plainfield to a gas station where he refueled his van.  Surveillance of Nevius continued as he left the area and eventually entered the New Jersey Turnpike traveling southbound.  Shortly after the van entered the Turnpike, Bergin joined the surveillance.  Bergin coordinated with the NJSP to initiate an investigative stop of the van pursuant to a belief that Nevius was transporting narcotics in the black plastic bag, and after receiving authorization from Defendant Hampton to conduct the stop.  The van had traveled approximately fourteen miles on the southbound Turnpike before being directed to pull over to the side of the road in Cranbury Township by Trooper Levash, traveling in a marked NJSP patrol car.  The stop began at approximately 4:35 pm when Defendant Levash approached the passenger's side of the van to request Nevius's driving credentials and, according to Nevius, complained that the van's tail light was not working properly.  Bergin arrived shortly thereafter.  After approximately fifteen minutes, Nevius exited his vehicle at the troopers' request and was patted down shortly after he reached back into his car to obtain his jacket.  Bergin then posed several questions relating to Plaintiff's past and intended travel plans.  Plaintiff responded that he had spent the day at a relative's home in Plainfield, and stated that he made no other stops and met with no other individuals, a representation Bergin knew to be false due to his earlier surveillance of Nevius and Gray.  Plaintiff also mentioned that he was en route to Delaware to attend a family funeral.  Shortly after this conversation, the troopers presented Nevius with a consent to search form.  According to the NJSP Defendants, Plaintiff volunteered to have his vehicle searched.  (Ex. I at 70.)  Plaintiff, however, maintains that he consented to a search of the van only after having been asked to do so by the police.

4

(Nevius Cert. ¶ 3.)  Nevius maintains that,

> Upon reviewing the consent form [supplied by the troopers,] I
> informed [the troopers] that I had the right to refuse consent and
> depart if no other reason for detaining me existed.  I was told that
> refusing to consent indicated that I had something to hide and that
> my options were either to sign the consent form or have the
> officers obtain a search warrant and narcotics dog.  I responded that
> it appeared as if I did not have a choice.  I then signed the consent
> form to search my vehicle. . . To my recollection, I asked the
> officers numerous times to cease the search of my vehicle and
> obtain a warrant.  These requests were refused and ignored by the
> officers.

(*Id.* ¶¶ 4, 6.)  The troopers then commenced a search of the van, which included dismantling

portions of the vehicle.  At some point, Defendants Bergin and Levash requested a canine unit be

dispatched to search the van.  Trooper Bucchere (not a named defendant in this action) arrived

with the canine around 5:50 pm, but after exposing the animal to the van's interior, the dog failed

to alert as to the presence of any evidence of drugs.  The troopers began to reassemble the parts

around 6:10 pm and the search was completed around 6:45 pm, having produced no evidence of

criminal activity.  Nevius departed the premises approximately twenty minutes later, after having

surveyed the damage to his van and asking the troopers a few more questions.  During the

pendency of the search, Nevius expressed dismay at the physical damage being done to his van

and received assurances from the troopers that the van would be reassembled.  Nevius and the

officers conversed throughout the search, discussing topics as varied as the North Carolina real

estate market, the NBA play-offs, and "cop shows."

Several days after the Turnpike stop on December 12, 2006, a telephone conversation

between Nevius and Gray was intercepted, during which the two men discussed observing what

they believed to be police surveillance on the day of the stop.  Nevius specifically relayed to Gray

that he had been in touch with the NAACP in connection with the stop. He further stated his intention to pursue legal action based on the stop.  The next day, on December 13, 2006, Bergin, Hampton, and members of the Plainfield police department executed a search warrant at the 540 West Fifth Street residence.  The police seized heroin, crack cocaine, bags of cash, and other illegal paraphernalia during the search, and Gray was consequently arrested at the site. Gray was subsequently indicted by a Union County Grand Jury on first degree drug charges.

Plaintiff Nevius filed a complaint with this Court on July 31, 2007 and an amended complaint on August 30, 2007, alleging violations of his constitutional rights.[8]  The parties have exchanged Rule 26 disclosures but discovery has not yet commenced.  Both the NJTA Defendants and the NJSP Defendants filed their respective motions to dismiss and for summary judgment on May 9, 2008.  Plaintiff opposes both motions.[9]

## II.   Discussion

This Court has jurisdiction over this case pursuant to 28 U.S.C. § 1331, as Plaintiff

---

[8]       Plaintiff submitted a proposed second amended Complaint as part of his opposition to defendants' motions.   In this proposed second amended Complaint, Plaintiff withdraws Count Three (§ 1981), Four (§ 1985), Five (§ 1986), and Eight (violation of New Jersey Law Against Discrimination) from the previously filed Complaint.  Plaintiff confirmed at oral argument that these claims were withdrawn.  Because the amendments included in the proposed second amended Complaint do not materially change any of the remaining claims from Plaintiff's amended Complaint, the Court will consider the proposed second amended Complaint and all references to the "Complaint" will be understood to refer to this document. Therefore, the remaining counts in the Complaint are as follows:  violation of the New Jersey State Constitution and Civil Rights Laws (Count One) and violation of Plaintiff's constitutional and civil rights pursuant to 42 U.S.C. § 1983 (Counts Two, Three, and Four).

[9]       Due to a docketing error, Plaintiff's submission in opposition to the NJSP's summary judgment motion was not properly filed until October 23, 2008.  However, as both the NJSP and NJTA Defendants addressed Plaintiff's opposition and cross-motion in their Reply Briefs, the Court will not address the docketing error.

6

advanced claims under 42 U.S.C. § 1983, and over the related state law claims pursuant to 28 U.S.C. § 1367.  Plaintiff's claims, as set forth in his Complaint, are as follows:  Count One, in which Plaintiff claims that the acts of the troopers constituted a custom by all defendants of discriminating, "falsely arresting[ing] and detain[ing], and illegally search[ing]" the Plaintiff, and presumably other motorists, in contravention of the New Jersey State Constitution and the New Jersey Civil Rights Act; Count Two, in which Plaintiff complains the NJSP Defendants individually and as a group participated and conspired with one another under color of state law to deprive Plaintiff of his constitutional rights; Count Three, in which Plaintiff alleges that the NJTA Defendants negligently trained and disciplined the state troopers and adopted a custom of condoning the constitutionally deficient conduct of the state troopers, in violation of Plaintiff's civil and constitutional rights; and Count Four, in which Plaintiff seeks injunctive relief from Superintendent Fuentes, the NJSP, and the NJTA Defendants.  Plaintiff also seeks general compensatory damages and attorneys' fees.

**A.     Standards of Review**

The NJSP Defendants moved to summarily dismiss Plaintiff's claims under Rule 56 and the NJTA Defendants joined in that motion.[10]  The NJTA Defendants also moved to dismiss Plaintiff's Complaint pursuant to Rule 12(c).  Therefore, both standards are set forth below.

**1.     Standard of Review Under Rule 56**

---

[10]     Stating that, "[t]he liability, if any, of the NJTA [D]efendants would be derivative liability stemming from a finding that one or more of the codefendants engaged in law enforcement activity that deprived [P]laintiff of rights protected by federal and/or New Jersey law. . . . A finding that the codefendants' conduct pertaining to the stop and detention of [P]laintiff was lawful would . . . necessitate a finding that the [NJTA Defendants] have no liability."  (Letter from NJTA Defendants' Counsel to the Court (May 29, 2008) (Docket Entry No. 17).)

A court shall grant summary judgment under Rule 56(c) of the Federal Rules of Civil Procedure "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The substantive law identifies which facts are critical or "material." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A material fact raises a "genuine" issue "if the evidence is such that a reasonable jury could return a verdict" for the non-moving party. *Healy v. N.Y. Life Ins. Co.*, 860 F.2d 1209, 1219 n.3 (3d Cir. 1988).

On a summary judgment motion, the moving party must first show that no genuine issue of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party makes this showing, the burden shifts to the non-moving party to present evidence that a genuine fact issue compels a trial. *Id.* at 324. In so presenting, the non-moving party may not simply rest on its pleadings, but must offer admissible evidence that establishes a genuine issue of material fact, *id.*, not just "some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

The Court must consider all facts and their logical inferences in the light most favorable to the non-moving party. *Pollock v. American Tel. & Tel. Long Lines*, 794 F.2d 860, 864 (3d Cir. 1986). The Court shall not "weigh the evidence and determine the truth of the matter," but need determine only whether a genuine issue necessitates a trial. *Anderson*, 477 U.S. at 249. If the non-moving party fails to demonstrate proof beyond a "mere scintilla" of evidence that a genuine issue of material fact exists, then the Court must grant summary judgment. *Big Apple BMW v. BMW of North America*, 974 F.2d 1358, 1363 (3d Cir. 1992).

### 2.      Standard of Review Under Rule 12(c)

Rule 12(c) of the Federal Rules of Civil Procedure allows a party to move for judgment on the pleadings "after the pleadings are closed but within such time as not to delay trial . . ." Fed. R. Civ. P. 12(c).  The applicable standard on a motion for judgment on the pleadings is materially the same standard applied on a motion to dismiss pursuant to Rule 12(b)(6).  *See Spruill v. Gillis*, 372 F.3d 218, 223 n.2 (3d Cir. 2004).  In reviewing a motion made pursuant to Rule 12(c), a court must take all allegations in the complaint as true, viewed in the light most favorable to the plaintiff. *See Gomez v. Toledo*, 446 U.S. 635, 636 n.3 (1980); *Robb v. City of Philadelphia*, 733 F.2d 286, 287 (3d Cir. 1984).  Under Rule 12(c), "judgment will not be granted unless the movant clearly establishes that no material issue of fact remains to be resolved and that he is entitled to judgment as a matter of law."  *Jablonski v. Pan American World Airways, Inc.*, 863 F.2d 289, 290 (3d Cir. 1988) (citation omitted).

**B.    Claims Brought Pursuant to § 1983**

In support of their motion for summary disposition, the NJSP Defendants argue that they are entitled to Eleventh Amendment immunity and qualified immunity, and that Plaintiff has failed to allege any viable constitutional claims.  In addition to joining the NJSP Defendants' summary judgment motion, the NJTA Defendants argue, in support of their motion to dismiss, that even if the NJSP troopers' conduct was unconstitutional, the NJTA lacked policy-making authority concerning the law enforcement activities of the troopers.  Each count is addressed below.

**1.    Qualified Immunity Defense**

The NJSP Trooper Defendants argue that all counts against them should be dismissed on the basis of qualified immunity.  Qualified immunity is an affirmative defense intended to shield

9

government officials performing discretionary functions from liability for civil damages,

provided their conduct "does not violate clearly established statutory or constitutional rights of

which a reasonable person would have known." *Kopec v. Tate*, 361 F.3d 772, 776 (3d Cir. 2004)

(citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  Municipalities and individuals sued in

their official capacity are not accorded qualified immunity; only police officers sued in their

individual capacities may assert this defense.  *See Owen v. City of Independence*, 445 U.S. 622,

650 (1980) (rejecting the claim that municipalities are afforded qualified immunity); *W.B. v.

Matula*, 67 F.3d 484, 499 (3d Cir. 1995) ("the doctrine of qualified immunity shields officials

acting only in their individual capacities").  Qualified immunity is a matter of law to be decided

by the Court.  *See Carswell v. Borough of Homestead*, 381 F.3d 235, 242 (3d Cir. 2004) ("The

court must make the ultimate determination on the availability of qualified immunity as a matter

of law.").

In *Saucier v. Katz*, 533 U.S. 194 (2001), the United States Supreme Court held that a

claim of qualified immunity must be analyzed using a two-step inquiry.  The threshold question

the court must examine is whether, taken in the light most favorable to the party asserting the

injury, the facts alleged show that the officer's conduct violated a constitutional right.  *Saucier*,

533 U.S. at 201.  This inquiry is a matter of law for the court to decide.  *Siegart v. Gilley*, 500

U.S. 226, 232 (1991).  If the plaintiff fails to make out a constitutional violation, the qualified

immunity inquiry does not need to proceed further.  *Bennett v. Murphy*, 274 F.3d 133, 136 (3d

Cir. 2002).  If the plaintiff establishes a constitutional violation, however, the court must then

examine whether the right violated is "clearly established."  *Saucier*, 533 U.S. at 201.  More

specifically, "the right the official is alleged to have violated must have been 'clearly established'

in a more particularized, and hence more relevant sense: the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987).

Government officials are shielded from liability if they act "reasonably but mistakenly." *Id.* at 641. "[T]he Supreme Court has emphasized that the inquiry is whether a reasonable officer could have believed that his or her conduct was lawful, in light of the clearly established law and the information in the officer's possession." *Sharrar v. Felsing*, 128 F.3d 810, 826 (3d Cir. 1997) (*abrogated on other grounds* by *Curley v. Klem,* 499 F.3d 199 (3d Cir. 2007)). A court must therefore objectively evaluate whether a reasonable officer would comprehend that his actions at the time violated clearly established law. *See Anderson*, 483 U.S. at 639 ("Whether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the 'objective legal reasonableness' of the action...assessed in light of the legal rules that were 'clearly established' at the time [the action] was taken."). In other words, a court must judge the reasonableness of the action "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham v. Connor*, 490 U.S. 386, 396 (1989) (citing *Terry v. Ohio*, 392 U.S. 1, 20-22 (1968)). Thus, "[t]his immunity is broad in scope and protects all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986). The Third Circuit recently clarified that, "[a]t the risk of understating the challenges inherent in a qualified immunity analysis, we think the most helpful approach is to consider the constitutional question as being whether the officer made a reasonable mistake of fact, while the qualified immunity question is whether the officer was reasonably mistaken about the state of the law." *Curley*, 499 F.3d at 214.

11

### 2.      Liability under 42 U.S.C. § 1983

Section 1983, Title 42 of the United States Code, in pertinent part, states:

> Every person who, under color of any statute, ordinance,
> regulation, custom, or usage, of any State or Territory or the
> District of Columbia, subjects, or causes to be subjected, any
> citizen of the United States or other person within the jurisdiction
> thereof to the deprivation of any rights, privileges, or immunities
> secured by the Constitution and laws, shall be liable to the party
> injured in an action at law, suit in equity, or other proper proceeding
> for redress.

Because § 1983 does not create any substantive rights but, rather, a remedy for a deprivation of

rights established by the Constitution or other federal laws, in order to state a claim for relief

pursuant to § 1983, a plaintiff must identify: "(1) of what constitutional or federal right he was

deprived, and (2) how he was deprived of that right under color of state law." *Gibson v.*

*Superintendent of New Jersey Dep't of Law & Pub. Safety*, 411 F.3d 427, 433 (3d Cir. 2005)

(citing *Leveto v. Lapina*, 258 F.2d 156, 161 (3d Cir. 2001)).

### 3.      Miscellaneous Constitutional Claims (Count Two)

Count Two of Plaintiff's Complaint[11] seeks money damages against the Trooper

Defendants and Superintendent Fuentes[12] and appears to allege violations of no less than nine

---

[11]      Count Two of Plaintiff's Complaint imputes the following allegedly
constitutionally deficient conduct to the Trooper Defendants: "a. stopping and detaining Plaintiff
without probable cause; b. falsely arresting Plaintiff; c. Illegally searching Plaintiff's person,
vehicle and effects; d. falsely imprisoning and/or detaining Plaintiff; e. improperly denying
Plaintiff's right to privacy; f. denying Plaintiff his right to freedom of travel; g. depriving
Plaintiff of his right to due process; h. depriving Plaintiff of his right to equal protection of the
laws; i. depriving Plaintiff of his associational rights." (Compl. ¶ 41.)

[12]      As Plaintiff failed to allege that Defendant Fuentes was present at the traffic stop,
the claims contained within Count Two of the Complaint are hereby dismissed against this
defendant.  Liability attaches to an individual defendant only where he or she was personally
involved with the alleged constitutional violations.  *Rode v. Dellarciprete*, 845 F.2d 1195, 1207

constitutional guarantees.  Specifically, Plaintiff alleges his constitutional rights were violated when: (a) the troopers stopped and searched Plaintiff's van, and seized Plaintiff without probable cause or reasonable suspicion (the "Fourth Amendment claims"[13]); (b) the troopers failed to administer *Miranda* warnings to Plaintiff while he was allegedly in their custody (the "Fifth Amendment claim"); and (c) the NJSP troopers "targeted" Plaintiff "without a scintilla of evidence of Nevius'[s] involvement with crime . . . [based] merely [on Plaintiff's] association with an individual suspected of narcotics infractions" (the "First Amendment claim").  (Pl. Br. in Opp'n to NJSP Defs.' Mot. for Summ. J. at 16.)  Plaintiff also claims that his rights to equal protection, due process, and travel were violated (Compl. ¶¶ 41(h), (g), (f)), but fails to advance any legal theory or set of facts to support these claims.  Accordingly, these three claims are dismissed.  The remaining claims are discussed below.

a.     *Fourth Amendment Claims*

Plaintiff claims that the Trooper Defendants lacked reasonable suspicion and/or probable cause to initiate the December 9 vehicle stop, and ignored his attempts to withdraw his consent to search his vehicle, and therefore violated his Fourth Amendment right to be free from

---

(3d Cir. 1988). A defendant's "[p]ersonal involvement can be shown through allegations of personal direction or of actual knowledge and acquiescence." *Id.*  However, allegations of participation or actual knowledge and acquiescence must be made with appropriate particularity. *Id.*  Nevius has failed to make such a showing.

[13]     The Court places the following allegations within this category: "a. stopping and detaining Plaintiff without probable cause; b. falsely arresting Plaintiff; c. Illegally searching Plaintiff's person, vehicle and effects; d. falsely imprisoning and/or detaining Plaintiff; [and] e. improperly denying Plaintiff's right to privacy."  (Compl. ¶ 41.)  The Court notes that the NJSP Defendants argued against finding a Fourth Amendment violation based on excessive force, though no such violation is alleged in the Complaint. Therefore, the Court need not consider the argument.

unreasonable searches and seizures.  The Trooper Defendants claim that probable cause, and

therefore reasonable suspicion as well, existed at the time of the stop.  The Trooper Defendants

also deny Plaintiff's allegation that he attempted to revoke his consent during the stop.  They also

claim that all of their conduct during the December 9 stop is protected by a qualified immunity.

The Court finds that the undisputed facts fail to establish that any Fourth Amendment violations

resulted from the stop, and, in any event, agrees that the doctrine of qualified immunity applies.

Plaintiff's Fourth Amendment claims in Count Two of his Complaint are accordingly dismissed.

"The Fourth Amendment prohibits unreasonable searches and seizures by the

Government, and its protections extend to brief investigatory stops of persons or vehicles that fall

short of traditional arrest."  *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (internal quotations

omitted).  Generally, a seizure of a person is reasonable only where the officers have a warrant or

probable cause.  *Shuman ex rel. Shwertzer v. Penn Manor Sch. Dist.*, 422 F.3d 141, 147 (3d Cir.

2005).  One exception is in the case of a more temporary seizure, known as an investigatory or

"*Terry*" stop, which can be constitutionally justified "when the officer has a reasonable,

articulable suspicion that criminal activity is afoot."  *Illinois v. Wardlow*, 528 U.S. 119, 123

(2000) (citing *Terry v. Ohio*, 392 U.S. 1, 30 (1968)).  While an officer must have probable cause

of criminal activity in order to lawfully arrest a person, an investigatory stop requires only

reasonable suspicion, "justified by some objective manifestation that the person stopped is, or is

about to be, engaged in criminal activity" based on an assessment of the totality of the

circumstances.  *United States v. Cortez*, 449 U.S. 411, 417 (1981); *see also Arvizu*, 534 U.S. at

274 ("the likelihood of criminal activity need not rise to the level required for probable cause,

and it falls considerably short of satisfying a preponderance of the evidence standard").  The

reasonable suspicion inquiry also takes stock of the officer's own background and training, and permits officers "to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person." *Arvizu*, 534 U.S. at 274.

Therefore, to determine whether a constitutional violation occurred due to the December 9 stop, the Court must consider whether reasonable suspicion was present when the NJSP Trooper Defendants stopped Nevius's van on the Turnpike. Plaintiff claims that summary judgment must be denied because there is a disputed issue of material fact, that is, whether Plaintiff's tail light was operational.[14] However, Plaintiff's argument misses the point. This Court finds that reasonable suspicion existed to conduct the stop because the totality of the circumstances would have given rise to a suspicion that Nevius was transporting illegal substances in his van – not because of a purported traffic violation. After intercepting numerous calls between Gray and several unidentified males regarding the quality of drugs supplied by Gray and intimating an imminent delivery of drugs, it was reasonable for Bergin to believe that there were illegal substances in the black plastic bag Nevius carried. Further, because Bergin did not see Gray or Nevius bring the black bag when they returned to 540 West Fifth Street, it was reasonable for Bergin to presume that the contraband remained in Nevius's van. In addition, the police had intercepted a telephone conversation between Gray and an unidentified male discussing the purchase of a van to transport narcotics to North Carolina so it was reasonable for the police to suspect that Nevius, traveling in a van with North Carolina license plates, was

---

[14] The Court notes that this fact is not in dispute as the NJSP Defendants have conceded that the tail light was operational.

involved in Gray's narcotics distribution enterprise.  All of these circumstances taken together adequately demonstrate that reasonable suspicion existed to effectuate the December 9 stop and that no constitutional violation occurred as a matter of law.  Finally, even if Defendant Bergin made an unreasonable mistake of fact that there was contraband in Nevius's van, the Trooper Defendants are entitled to qualified immunity because they were reasonable in believing, mistakenly or otherwise, they possessed the requisite level of reasonable suspicion.

Nevius also complains his Fourth Amendment rights were violated by the police initiating a search of his van without probable cause.  A warrantless search generally must be supported by probable cause.  *New Jersey v. T.L.O.*, 469 U.S. 325, 340 (1985).  However, a search conducted pursuant to consent is exempted from the warrant and probable cause requirements.  *Davis v. United States*, 328 U.S. 582, 593-94 (1946).  For such a search to be constitutionally viable, the consent be voluntary, and "[v]oluntariness is a question of fact to be determined from all the circumstances," including whether the consenting party knew of its right to refuse consent.  *Schneckloth v. Bustamore*, 412 U.S. 218, 219, 226 (1973).  The Supreme Court in *Schneckloth*, however, declined to require knowledge of the right to refuse a prerequisite to establishing voluntariness.  *Id.* at 232-33.  "Conversely, if under all the circumstances it has appeared that the consent was not given voluntarily-that it was coerced by threats or force, or granted only in submission to a claim of lawful authority-then we have found the consent invalid and the search unreasonable."  *Id.* at 233.  The Third Circuit has instructed that "the critical factors comprising a totality of the circumstances inquiry . . . includ[e] the setting in which the consent was obtained, the parties' verbal and non-verbal actions, and the age, intelligence, and educational background of the consenting individual."  *United States v. Givan*, 320 F.3d 452, 459 (3d Cir. 2003).

16

Plaintiff Nevius argues that his consent was "coerced" and that "he repeatedly invoked his right to end the search and for the NJSP [Trooper] Defendants to obtain a warrant, thereby effectively revoking his consent."  (Pl.'s Br. in Opp'n to NJSP Defs.' Mot. for Summ. J. 10-11.)  The Court has reviewed the evidence submitted and finds that Plaintiff has failed to raise a triable issue of material fact as to whether he revoked his consent to search the vehicle.  The surveillance tape submitted by the NJSP Defendants (Ex. O) shows Nevius interacting comfortably with the troopers, and asking them a variety of questions.  At no point does Nevius appear to ask the troopers to cease the search, though he does appear frustrated with the troopers because the reassembly of his van took longer than preferable.  Plaintiff relies on his own unsworn certification to oppose summary judgment on this ground, which is insufficient to defeat summary judgment.  The Court finds that none of the factors laid out in *Givan* warrant a finding that the consent was coerced.  Further, the Court finds that, even if Plaintiff could establish a constitutional violation, qualified immunity applies because it was reasonable for Bergin and Hampton to believe, even if mistakenly, that Nevius had given legally valid consent to search his van.

Because the Court finds that reasonable suspicion existed to conduct the investigative stop, and that Nevius consented to the search of his vehicle, it also finds that the attendant seizure of Nevius's person during the stop and search was justified.  *See United States v. Sharpe*, 470 U.S. 675, 686 (1985) ("In assessing whether a detention is too long in duration to be justified as an investigative stop, it is appropriate to examine whether police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant.").  Additionally, Nevius's prolonged detention was

17

justified by reasonable suspicion because Nevius had provided false and misleading responses to Bergin's itinerary questions.  *See Givan*, 320 F.3d at 459 (finding reasonable suspicion to extend a traffic stop and request consent to search a vehicle where the defendant-driver and a passenger offered conflicting information regarding their itinerary).

b.    *Fifth Amendment Claims*

Plaintiff appears to allege that he was deprived of his Fifth Amendment right that "no person . . . shall be compelled in any criminal case to be a witness against himself."  U.S. Const. amend. V.  Plaintiff's Complaint fails to offer additional information regarding this purported violation but his reply briefs note that, "[t]he failure of the NJSP Defendants to provide Nevius with his *Miranda* rights constitute a deprivation of his rights under the Fifth Amendment and . . . [the] Fourteenth Amendment Due Process."  (Pl.'s Br. in Opp'n to NJSP Defs.' Mot. for Summ. J. 14.)

Even assuming that Plaintiff is correct that he was held in "functional custody" without the provision of the *Miranda* warnings, Plaintiff cannot establish a constitutional violation on this theory.  It is well established that a Fifth Amendment violation based on a failure to administer *Miranda* warnings does not ripen until the un-Mirandized statements are used against the speaker in a criminal trial.  *United States v. Verdugo-Urquidez*, 494 U.S. 259, 264 (1990) ("The privilege against self-incrimination guaranteed by the Fifth Amendment is a fundamental *trial* right of criminal defendants.") (emphasis supplied).  That is, the failure to administer the warnings is not a violation *unless and until* criminal proceedings against the speaker have commenced because "violations of the prophylactic *Miranda* procedures do not amount to violations of the Constitution."  *Giuffre v. Bissell*, 31 F.3d 1241, 1256 (3d Cir. 1994).  As the

Third Circuit has stated explicitly, "questioning a plaintiff in custody without providing *Miranda* warnings is not a basis for a § 1983 claim as long as the plaintiff's statements are not used against her at trial." *Renda v. King*, 347 F.3d 550, 557-58 (3d Cir. 2003).  In addition to providing no counter argument in his briefing papers, Plaintiff has failed to allege any facts whatsoever suggesting that he was charged with any crime in connection with the December 9 stop or otherwise.  Accordingly, summary judgment on this claim is awarded in favor of Defendants.

c.      *First Amendment Claim*

Plaintiff's First Amendment claim under § 1983 is premised on his belief that he was "targeted by the NJSP Defendants merely through association with an individual suspected of narcotics infractions.  His subsequent detention was based on this mere association and clearly violates his associational rights."  (Pl.'s Br. in Opp'n to NJSP Defs.' Mot. for Summ. J. 16.)

The First Amendment protects an individual's right to freely associate without arbitrary government interference.  U.S. Cont. amend. I.  The Supreme Court has recognized that this guarantee embraces two types of association: intimate association and expressive association. *See Roberts v. United States Jaycees*, 468 U.S. 609 (1984).  Plaintiff is correct that a "friendship" such as the one he and Gray share could constitute an intimate association under the relevant case law.  However, this "friendship" was not the basis for the troopers' pursuit of Plaintiff.  Rather, Nevius was stopped on December 9 because he became implicated in an on-going criminal investigation into Gray's narcotics activity.  The Court is unaware of, and Plaintiff has not identified, a single case in which a court found § 1983 liability based on an infringement of an individual's right to intimate association where the offensive state action is comprised of a police

19

investigation into allegations of criminal misconduct.  This claim is accordingly dismissed.

### 4.   Negligent Training (Count Three)

Count Three seeks money damages from the NJTA Defendants and alleges that the NJTA "was negligent in screening, hiring, training, supervising, disciplining and/or retaining the [NJSP] Defendants in this matter . . . and because it permitted conditions to exist which facilitated and/or permitted such [constitutionally deficient] conduct to occur."  (Compl. ¶¶ 56, 57.)  The NJTA Defendants argue that because the NJTA does not possess supervisory authority over the NJSP, they cannot be liable under § 1983 for any unlawful conduct undertaken by the NJSP.  The Court agrees.

Though a municipal corporation[15] cannot be held liable under § 1983 based on a theory of *respondeat superior*, it can be sued directly under § 1983 if the action that caused a constitutional tort was based on a municipal custom or policy.  *See Monell v. Dept. of Soc. Servs. of the City of New York*, 436 U.S. 658, 694 (1978) ( "A local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents.  Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government entity as an entity is responsible under § 1983.")  Further, "municipal liability under § 1983 attaches where . . . a deliberate choice to follow a course of action is made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in

---

[15]    Courts have treated the NJTA as a municipal corporation for purposes of § 1983 litigation and the NJTA Defendants have not challenged that proposition in connection with their motion.  (*See* NJTA Defs.' Br. 7; Reply Br. 2.)  Municipalities do not enjoy immunity from suit, either qualified or absolute, under § 1983.  *Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit*, 507 U.S. 163, 166 (1993).

question." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 483 (1986).  Authority to set policy may

be granted directly by statute or regulation or through delegation by an official possessing policy-

setting authority.  *Id.*

The plaintiff bears the burden of producing evidence of the establishment and existence

of a specific policy or custom that violated the plaintiff's constitutional rights.  *See Gittlemacker*

*v. Prasse*, 428 F.2d 1, 3 (3d Cir. 1970).  A "policy" is made when a "statement, ordinance,

regulation, or decision" is "officially adopted and promulgated by that body's officers."  *Monell*,

436 U.S. at 690.   In contrast, a "custom" is "a given course of conduct, although not specifically

endorsed or authorized by law . . . so well-settled and permanent as virtually to constitute law."

*Bielevicz v. Dubinon*, 915 F.2d 845, 850 (3d Cir. 1990).  The existence of a policy or custom

cannot be inferred from a single, isolated municipal act, and must demonstrate that the municipal

entity itself is the "moving force behind the deprivation."  *See Kentucky v. Graham*, 473 U.S.

159, 166 (1985).  The Supreme Court has thus directed that the "first inquiry in any case alleging

municipal liability under § 1983 is the question whether there is a direct causal link between a

municipal policy or custom and the alleged constitutional deprivation."  *City of Canton v. Harris*,

489 U.S. 378, 386 (1989).

In the instant case, Plaintiff states that the NJTA "has engaged in a policy or custom of

allowing the NJSP to engage in unlawful conduct in violation of the rights of motorists traveling

the New Jersey Turnpike," (Pl.'s Br. in Opp'n to NJTA Defs.' Mot. to Dismiss 8), and further

claims that "the [NJTA] has been aware and on notice of NJSP misconduct on the Turnpike for

well over a decade" but "has failed and refused to insure that the NJSP abandon the illegal . . .

practices."  (Compl. ¶¶ 33, 35.)  Because Plaintiff has not identified any official NJTA policy, he

instead argues that NJTA's "failure . . . to take proactive measures to train, supervise or discipline the NJSP amounts to a . . . permanent, pervasive and well-settled custom or practice." (Pl.'s Br. in Opp'n to NJTA Defs.' Mot. to Dismiss 11.)

The Court first notes that failure to train claims sounding in negligence do not establish a constitutional violation under § 1983 as a matter of law. *See City of Canton*, 489 U.S. at 388 (holding that, "[t]hough we agree . . . that a city can be liable under § 1983 for inadequate training of its employees, . . . [w]e hold today that the inadequacy of police training may serve as the basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact. . . . Only where a failure to train reflects a 'deliberate' or 'conscious' choice by a municipality – a 'policy' as defined by our prior cases – can a city be liable for such a failure under § 1983."). Therefore, to the extent Plaintiff advances these claims on a negligence theory (*see* Compl. ¶ 56), those claims are dismissed.

However, Plaintiff's claims fail under the deliberate indifference standard as well. First, neither the NJTA nor the NJTA Head possess the type of supervisory control over the NJSP regarding training or supervision required to impose liability, and Plaintiff is therefore unable to demonstrate that NJTA "had the power to make official policy on a particular issue." *McMillian v. Monroe County*, 520 U.S. 781, 785 (1997) (noting that, "the challenged action must have been taken pursuant to a policy adopted by the official or officials responsible under state law for making policy in that area of the [municipality's] business"). As a matter of New Jersey law, the NJTA Defendants do not have the authority to establish any policy, practice, or custom regarding the conduct of NJSP troopers working on the Turnpike. The power to train, hire, fire, discipline, and supervise the NJSP troopers is vested exclusively in the Superintendent of the NJSP. *See*

22

N.J.S.A. §§ 53:1-8, 53:1-9, 53:1-10.  More general authority over NJSP trooper conduct is entrusted to the Attorney General of the State of New Jersey, as the chief law enforcement officer for the state.  *See* N.J.S.A. § 52.17B-98.  It is clear that the NJTA Defendants do not have the expansive authority over the conduct of the NJSP troopers that Plaintiff contemplates in his briefing papers, and his arguments to the contrary, relying heavily on an indemnification provision in the contract between the NJTA and the NJSP, are unavailing.  In addition, Plaintiff was stopped as a result of an ongoing criminal investigation so even if the Court were to conclude that the NJTA Defendants did have such authority, and did endorse a policy of inaction as Plaintiff describes, such a policy still could not be understood as the "moving force" behind the December 9 stop.  The troopers could have effectuated the December 9 stop on any city street as easily as on the Turnpike, and there is simply no plausible argument that the NJTA Defendants should be held liable simply due to the stop's geographical location.  Therefore, Plaintiff is unable to establish that any custom of the NJTA caused the alleged constitutional deprivation and the claims against the NJTA are accordingly dismissed.

### 5.  Claim for Injunctive Relief (Count Four)

Plaintiff also seeks injunctive relief against Superintendent Fuentes, the NJSP, and the NJTA Defendants for violations of his constitutional rights under § 1983.  Specifically, Plaintiff's prayer for relief requests:

> 1.  An order permanently restraining and enjoining the [NJSP] and the [NJTA] from encouraging, teaching, training, condoning or tolerating officers in making arrests, stops or taking other law enforcement action in the manner described above;
> 2.  An order compelling the [NJSP] and the [NJTA] to take prompt, appropriate and effective corrective measures, including those that affect supervisors and personnel to prevent any policies,

patterns and all practices that encourage, teach, train, and condone officers or employees in making any arrests, stops, searches or taking other law enforcement action in a constitutionally deficient manner;

3. An order that the NJSP and the [NJTA] implement a system in which prompt, appropriate and effective disciplinary action is taken against anyone who engages in, teaches, trains, encourages or condones making any arrests, stops, searches or other law enforcement in a constitutionally deficient manner;

4. An order compelling the NJSP and he [NJTA] to implement a system pursuant to which statistical information and records regarding the race of all individuals stopped, detained, searched or arrested by the NJSP are maintained and disseminated to the public;

5. An order permanently restraining and enjoining the [NJSP] and the [NJTA] from encouraging, teaching, training, condoning or tolerating officers in making arrests, stops or taking other law enforcement action which in any way is intended to produce any of the constitutional violations described herein; [and]

6. Any other prospective injunctive relief that the Court finds just and appropriate under the circumstances.

(Ex. to Pl.'s Br. in Opp'n to NJSP Defs.' Mot. for Summ. J. (Docket Entry No. 29-4).)  In order to obtain prospective, injunctive relief, Nevius must demonstrate that he is likely to suffer future injury from defendants' threatened alleged conduct. *See City of Los Angeles v. Lyons*, 461 U.S. 95, 105 (1983) (holding that, even if the plaintiff could maintain a claim for damages based on his injuries, injunctive relief was not available where plaintiff failed to demonstrate a real and immediate threat of being subjected to the same allegedly unlawful conduct again).  Nevius has submitted no evidence or arguments to advance his claims for injunctive relief, nor has he made any allegations that he fears a reprisal in the future.  To sustain his injunctive relief claim, Nevius would have to establish either that all NJSP troopers operating on the Turnpike always violate motorists' Fourth, Fifth, and First Amendment rights by performing investigatory stops, or that an NJSP policy "ordered or authorized [the troopers] to act in such a manner."  *Id.* at 105-106.

24

Nevius would be unable to make any such showing because, as discussed numerous times above, the NJSP troopers stopped Nevius's van as part of an on-going criminal investigation.  The injunctive relief claims are therefore dismissed as against Superintendent Fuentes, the NJSP, and the NJTA Defendants.

### C.       Claims Brought Pursuant to New Jersey State Law (Count One)

Having dismissed Plaintiff's § 1983 claims, no federal claims remain in this case.  The claims that remain are the state constitutional claims contained in Count One of Plaintiff's Complaint. "[W]here the claim over which the district court has original jurisdiction is dismissed before trial, the district court must decline to decide the pendent state claims unless considerations of judicial economy, convenience, and fairness to the parties provide an affirmative justification for doing so."  *Borough of West Mifflin v. Lancaster*, 45 F.3d 780, 788 (3d Cir. 1995).  *See also* 28 U.S.C. § 1367(c)(3) ("The district courts may decline to exercise supplemental jurisdiction over a [state law claim] if ... the district court has dismissed all claims over which it has original jurisdiction...."); *Markowitz v. Northeast Land Co.*, 906 F.2d 100, 106 (3d Cir.1990) ("[T]he rule within this Circuit is that once all claims with an independent basis of federal jurisdiction have been dismissed the case no longer belongs in federal court."); *Bright v. Westmoreland County*, 380 F.3d 729, 751 (3d Cir. 2004) ("[A]bsent extraordinary circumstances, where the federal causes of action are dismissed the district court should 'ordinarily refrain from exercising pendent jurisdiction [over the state law claims].'") (quoting *Rolo v. City Investing Co. Liquidating Trust*, 845 F. Supp. 182, 215 (D.N.J.1993)).  Importantly, as pointed out by the Supreme Court, "[n]eedless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of

applicable law." *United Mine Workers v. Gibbs*, 383 U.S. 715, 726, 86 S. Ct. 1130, 16 L. Ed.2d 218 (1966).

Upon reviewing the record in this case, the Court finds that there are no extraordinary circumstances that would warrant exercising supplemental jurisdiction over the state law claims. Accordingly, the Court declines to exercise supplemental jurisdiction over the remaining claims in this case.

**III.   Conclusion**

For the reasons described above, both the NJTA Defendants' motion to dismiss pursuant to Rule 12(c) and the NJSP Defendants' motion for summary judgment pursuant to Rule 56 are granted.  An appropriate Order accompanies this Opinion.

Dated: January 20, 2009                    /s/      JOEL A. PISANO
                                           United States District Judge